OPINION OF THE COURT
Chief Judge Bkeitel.
Defendants David Safian and Robert Miner appeal from affirmances of their convictions for the murder of Safian’s wife by Miner, a killer unknown to the wife and confessedly hired by Safian, and for possession of a weapon. At their joint trial, the confession of each defendant was admitted, with repeated and explicit instructions by the Trial Justice that each defendant’s confession was to be considered against the confessing defendant only, and not against the codefendant.
The issue is whether, despite the substantial identity of the two confessions, failure to grant a severance resulted in a trial *185 hopelessly tainted by the admission of the codefendants’ confessions (see Bruton v United States, 391 US 123).
There should be affirmances as to both defendants. Each defendant’s confession contained the same material facts. There was, therefore, no significant risk that either defendant would be improperly prejudiced by admission of his codefendant’s confession (see People v McNeil, 24 NY2d 550, 552-553, remittitur amd 25 NY2d 888, cert den sub nom. Spain v New York, 396 US 937).
There is no dispute in this court, as there was none in the Appellate Division, that defendant Miner suffered no significant prejudice from admission of his codefendant’s confession. It is the case of defendant Safian that has provoked dissent, both in the Appellate Division and in this court. Yet the same principles apply, and those principles permit, and require, affirmance of Safian’s conviction as well.
Defendant David Safian, separated from his wife for a year, unsuccessfully sought reconciliation in April, 1975. When he was rebuffed, he told his wife that their daughter, one of her two children, would eventually live with him and that, according to the testimony of a friend of the wife, the daughter "would not live with Debbie”, the wife.
Meanwhile, on March 5, 1975, defendant Safian, aged 27, had met Robert Miner, aged 16, who was then, for no known reason, kicking and damaging Safian’s automobile. Safian had Miner arrested, but Miner later apologized and had the car repaired. Still later, Safian met Miner in a bar and, as Safian confessed in writing, told him that he was "looking for some crazy guy to take care of this girl I know”. Miner, eager to buy a new motorcycle, evidently met Safian’s requirements, and asked for $1,500. The two ultimately struck a bargain on a price of $1,000. At least one witness described a meeting in a bar between Safian and Miner on April 24, 1975. Then, in preparation, Safian showed Miner his wife’s home, the restaurant at which she worked as a waitress, and her automobile. All of this, except for the dates, comes from Safian’s written confession.
On May 2, 1975, eight days after Safian and Miner had been seen together in a bar, Deborah Safian was stabbed 21 times in front of her home. A neighbor heard her screams for help, and then saw her fall. A man on a motorcycle, wearing a head and face helmet, was seen leaving the scene. Mrs. Safian was immediately taken to a hospital, where she soon died.
*186 Evidence was introduced to establish that the motorcycle on which the assailant fled resembled one owned by Miner. Blood was found on Miner’s motorcycle. Also, Miner owned a jacket similar to the one worn by Mrs. Safian’s killer. The jacket too was stained, with blood of the same type as the victim’s. This certainly suffices with respect to Safian’s culpability to tie Miner in as the person who committed the crime on behalf of Safian.
Actually even the evidence last discussed was not essential to establish that the crime had been committed at Safian’s behest. Safian’s confession did that. The statute, a restatement of the long-established law in this State, provides only: "A person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed” (CPL 60.50; e.g., People v Cuozzo, 292 NY 85, 91-93 [Desmond, J.], and cases there collected arising under the predecessor statute to CPL 60.50). Thus it has always been true that a confession may provide all the necessary proof of defendant’s culpability, and the statute only requires that the confessed crime be proven to have occurred by independent evidence without any other connection with the defendant or his confession.
Moreover, there is the proximity in time between Safian’s admitted meetings with Miner, one supposedly in late April, 1975, and the occurrence of the May 2 homicide they had discussed in those meetings. There is also the coincidence of place, Safian having said that he had pointed out to Miner the victim’s residence and automobile. In short, if, as is not the case, the confession required "corroboration” beyond the fact of the corpus delicti, there was ample evidence to "corroborate” the confession.
But the end is not yet. After the murder had been committed, Miner, according to Safian’s confession, met Safian "a couple of times” in the same bar in which the agreement to kill had been made. Miner asked Safian for his money and sought to make an appointment to arrange delivery. Before payment could be made, however, Safian confessed to the police. While others may raise doubts whether the intentional homicide of the wife was attributable to Safian’s agreement with Miner, Safian had no such doubts. That was shown by his description of his posthomicide meetings with Miner, in which *187 Miner asked to be paid. And, as discussed earlier, a confession analytically need not be "corroborated” but only supported by an independently proven corpus delicti (People v Cuozzo, supra).
Thus, on the evidence admissible against Safian, who did not testify and offered no evidence after the People rested, the proof was overpowering that Safian had hired Miner to kill his wife, and that she had in fact been intentionally killed. Entirely superfluous to certitude as to Safian’s guilt was any material contained in Miner’s confession, and admitted only against Miner.[1]
Of course, it is now established law that when introduction in evidence of the extrajudicial confession of a codefendant not testifying and not subject to cross-examination adds substantial weight to the prosecution’s case against another defendant, that defendant is denied his constitutional right to confrontation (Bruton v United States, 391 US 123, 127-128, supra). (See, also, Nelson v O’Neil, 402 US 622, 628, noting that the Supreme Court has never extended Bruton beyond its specific holding. The statement is still true.) The rule is based on the assumption that even when limiting instructions are given, jurors may not be capable of ignoring or willing to ignore portions of a codefendant’s confession that inculpate another defendant (Bruton v United States, supra, esp pp 135-136).
There are, of course, means of avoiding the prejudice contemplated in the Bruton case. Thus, when confessions of codefendants are involved, severance and separate trials will sometimes be appropriate and even mandatory (see CPL 200.40, subd 1). In other cases, redaction of offending portions of the confession or confessions may provide a satisfactory solution (see People v Boone, 22 NY2d 476, 485-486, cert den sub nom. Brandon v New York, 393 US 991). Neither solution, however, is ideal, for redaction is not always possible, and severance creates problems of its own, not the least of which *188 is duplication of effort on the part of court, prosecutor, and witnesses.
The Bruton rule is not absolute, nor should it be. It is a rule based on the probability of prejudice by inadmissible "hearsay”, and when that probability is negligible, as in this case, admission of a codefendant’s confession, subject of course to proper instructions, does not require reversal (see Harrington v California, 395 US 250, 253-254; Brown v United States, 411 US 223, 231-232; Schneble v Florida, 405 US 427, 429-432; see, also, People v Baker, 26 NY2d 169, 172-173).
This court, in accordance with these principles, has squarely held that "where each of the defendants has himself made a full and voluntary confession which is almost identical to the confessions of his codefendants”, the Bruton rule does not require reversal of a conviction (People v McNeil, 24 NY2d 550, 552, supra; see People v Benzinger, 36 NY2d 29, 34-35; see, also, People v Payne, 35 NY2d 22, 27-28). A similar rule has been applied in the Second Circuit Court of Appeals (see, e.g., United States ex rel. Stanbridge v Zelker, 514 F2d 45, 48-49, cert den 423 US 872; United States ex rel. Catanzaro v Mancusi, 404 F2d 296, 300, cert den 397 US 942). It has also been accepted in other Federal Courts of Appeals (see, e.g., Mack v Maggio, 538 F2d 1129, 1130-1131 [CCA 5th]; United States v Walton, 538 F2d 1348, 1352-1354 [CCA 8th], cert den 429 US 1025; United States v Spinks, 470 F2d 64, 65-66 [CCA 7th], cert den 409 US 1011; Metropolis v Turner, 437 F2d 207, 208-209 [CCA 10th]; but see Randolph v Parker, 575 F2d 1178, 1182-1184 [CCA 6th]; United States v Di Gilio, 538 F2d 972, 982 [CCA 3d], cert den sub nom. Lupo v United States, 429 US 1038). In the instant case, the joint trial of two confessed killers provides no reason in law or justice for departing from the established rule.
Safian’s confession is susceptible of only one interpretation: Safian hired Miner to kill his wife. True, in his confession, Safian said he had told Miner he was "looking for some crazy guy to take care of this girl I know”. But it is of no consequence that Safian used the euphemism of the street, "take care of’, instead of the blunt "kill”. It is disingenuous to contend, as does the dissent, that any logical or linguistic ambiguity was created by the phrase. If any confirmation were necessary, it was provided later in Safian’s confession.
In discussing payment after the homicide, Safian adopted the view that Miner had been "crazy” only in "the way he did *189 it”. Thus, in his confession Safian had stated that he had told Miner "he [Miner] was crazy, he was sick.” He added in his confession, "I don’t know maybe, the way he did it.” In short, his objection was to the "way” the 16-year-old Miner "did it”, not to the result produced. Never did Safian, in his confession, say that he did not wish his wife killed.[2]
Thus, without Miner’s confession, there is overwhelming evidence that Safian hired Miner to kill his wife, and that the wife was indeed intentionally killed. Certainly no more is needed to support the jury’s verdict against Safian. More important, however, is that Miner’s confession, although it provides additional detail about the killing itself, adds no material inculpatory evidence against Safian not already contained in Safian’s confession.
The Bruton rule, as noted above, is designed to prevent conviction of a defendant based in part on the jury’s knowledge of a codefendant’s inculpatory confession — evidence which may weigh heavily in the mind of the jurors despite its legal inadmissibility against defendant (see Bruton v United States, 391 US 123, 126, supra). How much more persuasive than a codefendant’s confession, however, would be defendant’s own confession to the crime charged. Presented with Safian’s own detailed written confession, the risk that jurors would be unduly prejudiced by anything added in Miner’s confession vanishes (see People v McNeil, 24 NY2d 550, 552-553, supra, quoting United States ex rel. Catanzaro v Mancusi, 404 F2d 296, 300, supra).
It is of course true that a codefendant’s confession is inadmissible against defendant not just because it is prejudicial — much admissible evidence is to some extent prejudicial— but because defendant may be left without the opportunity to confront and cross-examine his accuser. But when the co-defendant’s confession in narrating the operative facts tracks almost exactly defendant’s own story, the right to confront and cross-examine is of diminished usefulness (see United *190 States v Spinks, 470 F2d 64, 66, supra). Thus, it would have been of little benefit to Safian to confront Miner about his confession when Safian himself had admitted the same facts albeit with different versions of street language. The right to confrontation, the constitutional underpinning of the Bruton rule, provides therefore no basis for reversal of Safian’s conviction of the cold-blooded, hired killing of his wife.
There was, it must be conceded, an unfortunate reference in the prosecutor’s summation, in effect characterizing defendants as partners and indicating that "[statements made by or acts done by one partner are binding upon the other.” Objection was taken and overruled by the court. The prosecutor’s statement of law was, of course, erroneous, and had such statements pervaded the summation reversal might be required (see People v Baker, 23 NY2d 307, 318). But the error was isolated, and the Trial Justice’s careful instructions in his full charge vitiated any prejudice to defendant. Moreover, in light of the insurmountable case made against Safian, this one slip by the prosecutor would amount, at best, to harmléss error.
Once the solution to the Bruton issue is reached as discussed above, the defense contention, adopted by the dissent, that defendant was entitled to a charge of lesser included crimes evaporates. If Safian’s confession be accepted, as it must have been, the only crime of which Safian could be guilty, on any view of the evidence, was that of intentional murder (see CPL 300.50, subd 1).
 Neither justice, logic, nor practical experience requires severance of the trials of codefendants when live testimony of witnesses at trial is admissible against defendants and each defendant has made a full pretrial confession relating to the same material facts. Under such circumstances a joint trial does not improperly prejudice either defendant, nor does it deprive either of any legal right of confrontation. No two or more confessions, unless contrived, will be identical in language or detail, least of all among people who speak and think in street language. It is enough that their purport, in the vernacular, idiom, street language, or whatever kind of language, used, be the same. In this case the purport of the two confessions is the same and they mesh with respect to enough material elements to provide the identity required by the exceptions to the Bruton rule.
*191 Accordingly, the orders of the Appellate Division should be affirmed.

. Miner’s confession was consistent with Safian’s in all significant respects. Miner elaborated on his original discussions with Safian about the killing, indicating that Safian had told him he wanted two people "knocked off”, and that he needed a solid alibi for one. Initially, Miner had insisted that Safian obtain a "piece” for him, but later settled on a knife. He was in touch with Safian at a bar several times after the killing, and he told Safian it would have been better if Safian had told him that the victim was his wife, so that he could have taken additional precautions, presumably to avoid detection.

. Defendant Safian argues, and the dissent apparently agrees, surprisingly, that his confession differs from Miner’s in that he may have hired him at the bargained price of $1,000 to do some unspecified thing to his wife, less than killing, to teach her a lesson in the care of her children. However, logic and reality fail to connect the lesson with the husband or the children if whatever Miner was to do was not to be attributed to Safian. In fact, he, Safian, was anxious that the deed "to take care of” the victim occur at a time when he had an alibi to disassociate him entirely from the performance of the deed for which he had sought a "crazy guy” and agreed to pay a price of $1,000. Safian’s argument is as senseless as the crime itself.