OPINION OF THE COURT
Fuchsberg, J.
During a holdup at a drugstore in West Hempstead, Long Island, an elderly pharmacist, then on duty alone, was brutally attacked and killed. It is not disputed that the appellant, Harry Berzups, and his codefendant, Michael Massurin, acted in concert to commit the robbery of which the other crimes were the denouement. Tried together, they were each convicted of felony murder (Penal Law, § 125.25, subd 3), intentional murder (Penal Law, § 125.25, subd 1), robbery in the first degree (Penal Law, § 160.15), petit larceny (Penal Law, § 155.25), and possession of a dangerous weapon (Penal Law, § 265.01). In due course, they received concurrent sentences of imprisonment of 25 years to life on each murder count, zero to 25 years on the charge for robbery and one year each on the larceny and weapon charges.
Subsequently, the Appellate Division, while affirming the defendants’ convictions of all other crimes, reversed the robbery conviction as to each defendant on the rationale that, as *423 the predicate for the felony murder conviction, it necessarily was a lesser inclusory count of that crime.
On this appeal by Berzups alone,[1] a primary contention is that the consequence of the trial court’s rejection of his pretrial motion for a severance was to expose to the jury the inculpatory extrajudicial statements by Massurin, which, because the latter did not take the stand and therefore could not be cross-examined, deprived Berzups of his constitutional right to confrontation. It is also argued that it was error to deny Berzups’ motion to suppress, as the products of unlawful arrest and warrantless seizure, his own oral admissions, his bloodstained shoes and trousers and blood scrapings the police had taken from under his fingernails. Among other things, he takes the position too that the trial court should have granted his request that assault be charged as a lesser included offense of intentional murder. In addition to our being called upon to pass on these and certain subsidiary questions, the prosecution, by way of cross appeal, insists that, though the robbery served as the predicate for the felony murder charge, the conviction on that score also enjoyed a separate, self-standing status of its own and therefore should not have suffered a reversal. On the analysis which follows, we conclude that each of these propositions must be decided against the defendant.
The facts on which these issues rest are as simple as they are gruesome. Whatever seeming complexity there is arises out of the shifting stories by which each of the perpetrators, though ultimately conceding a crucial role for himself, would place the onus for dominance in their criminal undertaking on the other.
The relevant details start with the murder victim, whose body was discovered perforated by knife wounds, his jaw broken, his eye socket crushed, his skull shattered. It was evident that blunt forces in the form of a series of kicks and hammering with gallon-sized pharmaceutical glass jugs, the remnants of which were shattered about his body, had delivered violent blows to his head.
After removing the victim’s body to the hospital, an order slip the police found at the store led them to the defendant Massurin, who initially told the officers that he and Berzups had entered the store and forced the druggist into the rear at *424 knifepoint. However, on further questioning, he soon changed his tale to claim that Berzups had suggested the robbery and that, though he and Berzups had entered the store, it was the latter who displayed a knife and forced the murdered man into a back room from whence Massurin heard sounds of scuffling and then saw Berzups stab the pharmacist. In the final session of what was in effect a telescoped confession, Massurin stated he had thrown several jugs at the man on returning to the store briefly before he and Berzups departed.
Massurin’s information put the police on the trail of Berzups, whom they took into custody to police headquarters where, upon being advised of his rights under Miranda v Arizona (384 US 436), he insisted he knew nothing of the crime. At this time, a detective noticed that Berzups’ white shoes were stained in a reddish color on one heel and that he had a cut on one of his fingers, whereupon the police took possession of his shoes and had their scientific investigation bureau scrape the residue from under his fingernails. Shortly afterward, Berzups decided to make a fuller disclosure in which he related that it was Massurin who had proposed that they rob the drugstore and that, upon going there for that purpose, Berzups stood at the store entrance while Massurin first pushed the pharmacist into the back room and then began "throwing bottles into something”, later also telling Berzups that he had thrown a jug at the old man to prevent him from identifying his assailants. But when asked to sign a written statement, Berzups refused to do so and asked to speak to a lawyer, a request which the suppression Judge was to find was respected by cessation of further interrogation. However, pursuant to a warrant, a search of Berzups’ room turned up a pair of trousers with smatterings of blood on the cuff area of each leg and a quantity of drugs which proved to be of the same type stolen from the drugstore on the day of the murder. Later, police investigation led them to a bloodstained leather jacket, which one Leonard Holl had purchased from Berzups after the robbery.
At trial, Holl and Berzups added some further details. Holl testified that Berzups had confided in him that, on Massurin’s instructions, Berzups had tied up the druggist while Massurin ransacked the store and that, when the victim began to struggle, Massurin yelled, "Knock him out, knock him out”, in response to which Berzups kicked the elderly man in the jaw. According to what Berzups told his friend Holl, it was then *425 that Massurin suddenly pulled out a knife and repeatedly stabbed the druggist. Berzups, for his part, told the jury that it was he who announced "this is a stickup”, forced the pharmacist into the back room, tied his hands behind his back and, explaining that he had been influenced to do so by Massurin, worked himself into a "paranoid” frenzy in the course of which he kicked the floored victim in the jaw.
These facts in mind, we first note that this court has for some time made clear that the right of an accused to be confronted by the witnesses against him (US Const, 6th Amdt; NY Const, art I, §6) is not violated when one of several defendants has himself made a full and voluntary confession which is "almost identical” to the confessions of his implicated codefendants (People v McNeil, 24 NY2d 550, 552; see Parker v Randolph, 442 US 62).
As had the Supreme Court in Bruton v United States (391 US 123), we recognized that it is often not enough for the trial court to administer cautionary instructions that a jury is not to consider incriminating statements as evidence of guilt of anyone but the one who utters them. For, the admission of an extrajudicial confession of a defendant who, if he does not take the stand, remains beyond the scrutiny of cross-examination, deprives the codefendant who is implicated in that confession of his right to confrontation (Bruton v United States, supra, at pp 127-128, 135-136). But, while sensitive to the devastating potential of such prejudice, we have been unanimous in our realization that a codefendant’s confession need not violate the spirit of the Bruton rule when the implicated defendant himself has made a confession close enough to the one offered against him to make the probability of prejudice so "negligible” that in the end "the result would need to be the same” (People v Safian, 46 NY2d 181, 188 [majority opn], 194 [dissenting opn citing People v Fisher, 249 NY 419, 426]). The justification for this exception is that separate confessions, without being mirror images of one another, may yet be so duplicative in their description of the crucial facts that the one of the nontestifying codefendant may be of no measurable consequence in the face of the overwhelming and largely uncontroverted evidence contained in the interlocking confession of the defendant himself (Brown v United States, 411 US 223; Schneble v Florida, 405 US 427; Chapman v California, 386 US 18).
In this perspective, a synthesis of Massurin’s and Berzups’ *426 confessions makes for interesting comparison. Thus, Berzups’ initial story to the police was that Massurin suggested the robbery and Massurin, in turn, told the police that Berzups was its initiator. Critically, however, each made it clear that the criminal enterprise was jointly undertaken and neither suggested he had not entered upon it willingly and knowingly. Moreover, there was no denial that they divided the proceeds of the crime. Furthermore, Berzups admitted struggling with the pharmacist, hitting him and then, in the "paranoid” rage, stomping on the face and head of his victim to a point where the appellant’s hands, shoes and trousers were bloodied. For himself, Massurin admitted hurling the heavy gallon jugs. In sum, there was overlapping as to the willing participation in the robbery, the division of its proceeds and, mainly in each other’s presence, the joint striking of the victim in some form. Essentially, only Massurin’s claim that Berzups had used the knife on the pharmacist is unilateral, but in view of the uncontradicted medical testimony that the death had been produced by the violent conduct in its totality, with the lacerations least likely to have been fatal, hardly any legal significance would attach to the one who rendered the coup de grace. To paraphrase the language of Hall v Wolff (539 F2d 1146, 1148), "As to who used [the knife, the bottles or his feet], such fact is of no material consequence in this context”, since, by any objective measure, there was no "reasonable possibility that * * * [it] contributed to the conviction” (Schneble v Florida, 405 US 427, 432, supra).
We add that, in arriving at this conclusion, we place no reliance on the fact that Massurin earlier had taken the stand at the pretrial suppression hearing. Guilt and innocence were not then directly at stake. Moreover, but for the fact that the Massurin statements were interlocking and harmless, the narrower compass of such a preliminary hearing and the restrictions on the admissibility at trial of the testimony given by a defendant at that stage of a case (see People v Huntley, 46 Misc 2d 209, affd 27 AD2d 904, affd 21 NY2d 659; Richardson, Evidence [10th ed — Prince], § 550, p 553) would not necessarily have assured Berzups of a full-blown opportunity to exercise his privilege of confrontation. To the extent that People v Stanbridge (26 NY2d 1) is to the contrary, it is overruled.
Turning then to Berzups’ own postarrest confession and the seizure of his fingernail scrapings and bloodstained shoes *427 and clothing, appellant’s claim that each should have been suppressed does not survive scrutiny. Probable cause for the arrest is readily found in Massurin’s implication of Berzups, his ability to lead the police to him, and his accurate description of him (CPL 140.10, subd 1, par [b]). The warrant produced the trousers. Holl voluntarily surrendered the jacket and, as to the fingernail scrapings and the bloodspattering on the shoes, these were certainly subject to the exigency of easy eradication even while Berzups was in custody for the brutal and bloody murder (Cupp v Murphy, 412 US 291, 295-296; see People v Mitchell, 39 NY2d 173; People v Perel, 34 NY2d 462).
The assertion that assault should have been submitted as a lesser included offense of intentional murder is equally without merit. The rejection by the jury of the crimes of manslaughter in the first and second degree, which require culpable mental states essentially the same as that relevant for the crime of assault, coupled with the verdict on intentional murder, necessarily indicated that the jury had wholly discredited the defense theory that Berzups had acted without an intent to kill (see People v Finney, 33 NY2d 536, 537).[2]
Addressing now the issue presented upon the People’s cross appeal, we hold that the underlying felony of the felony murder charge was not a lesser included offense that merged in the conviction for which it was the predicate. Although an extremely literal reading of the statutes defining lesser included offenses (see CPL 300.40, subd 3; 300.50, subd 1) might suggest that felony murder be treated as nothing more than a felony with certain aggravating factors, namely the killing of a nonparticipant, the two crimes are "substantively and genetically entirely separate and disconnected offenses” (People v Nichols, 230 NY 221, 226). In contrast to the usual lesser included offense situation, in felony murder the underlying felony is not so much an element of the crime but instead functions as a replacement for the mens rea or intent necessary for common-law murder. This view accords with the historical development of the felony murder doctrine and the legislative policy reflected in its current statutory descendant, both of which underscore the fact that the corpus of the crime is the killing of another.
Manifesting this analysis is our recent decision in People v *428 Davis (46 NY2d 780), which held the corroboration requirement imposed by CPL 60.50 inapplicable to the underlying felony of robbery in a felony murder conviction (see People v Murray, 40 NY2d 327). Analogous, too, is People v Perez (45 NY2d 204), where, in finding that a conviction for robbery in the first degree, though committed while the defendant was armed with and threatening to use a knife, did not render a conviction for criminal possession of the knife a lesser inclusory concurrent count, we took the occasion to point out that "[b]ecause of the serious danger to the public posed by individuals who possess weapons * * * as a matter of policy, the Legislature could not have intended that a weapons possession charge * * * merge with the greater crime of robbery” (45 NY2d, at p 210). So also with an underlying felony of a felony murder charge.
For all these reasons, the order appealed from should be modified by restoring the conviction for robbery, the case should be remitted to the Appellate Division for review of the facts relating to the conviction (CPL 470.40, subd 2, par [b]) and, as so modified, the order should be affirmed.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
Order modified and the case remitted to the Appellate Division, Second Department, for further proceedings in accordance with the opinion herein and, as modified, affirmed.

. Massurin’s conviction was affirmed by the Appellate Division (People v Massurin, 56 AD2d 937) and leave to appeal to this court was denied (42 NY2d 829).

. Having considered the other contentions raised by the appellant, we find them equally unpersuasive.